**UNEXCELLED CHEMICAL CORPO-RATION, Plaintiff,**

v.

**DRAKE MANUFACTURING COMPANY, Defendant.**

**Civ. A. No. 334–55.**

United States District Court
D. New Jersey.
March 8, 1957.

Carpenter, Bennett, Beggans & Morrissey, Jersey City, N. J., by Milton A. Dauber, Jersey City, N. J., for plaintiff.

Samuel A. Wiener, Paterson, N. J., for defendant.

**WORTENDYKE, District Judge.**

In this diversity action plaintiff seeks damages for defendant's alleged breach of its agreement to deliver to the plaintiff certain prescribed minimum quantities of bomb parachute opening delay bodies [1] during the months of September, November and December, 1953. Defendant, admitting the charged breaches of its contract with the plaintiff, asserts that its failure to make delivery according to the contract schedule was caused by plaintiff's failure to perform its reciprocal agreement to furnish to the defendant clips [2] required to be attached to the bodies in the course of their processing by defendant. The answer, moreover, includes a counterclaim for damages for plaintiff's alleged failure to furnish required materials and to make payment as prescribed by the terms of the contract; also by reason of claimed unwarranted cancellation of the contract with consequent loss to the defendant.

Plaintiff charges that the bodies which defendant was called upon to process and deliver under purchase orders Nos. 11,603 and 11,604 were required by the plaintiff for its performance of its prime contracts with the Government, designated respectively as CML–37 and CML–50, to which the purchase orders expressly related, and that deliveries precisely according to schedule were necessary to enable plaintiff to fulfill its commitments under the prime contracts.[3] The damages which the plaintiff seeks are alleged to have resulted from the failure of the defendant to make deliveries in accordance with the schedule agreed upon.

The bases upon which plaintiff rests its claims for damages are three: (1) unproductive overhead expense which it necessarily incurred in reliance upon the promised availability of the bodies for further processing resulting from interruption of production by defendant's failure to meet delivery schedules; (2) general administrative expense necessarily incurred for the same purpose and continuing despite such interruptions of production; and (3) necessarily incurred stand-by labor costs during periods of such interruptions.

The asserted bases for defendant's counterclaim for damages are (1) alleged loss of profits by reason of plaintiff's premature cancellation of its contract (P.O. 11,604) with defendant, and (2) the amount of defendant's alleged consequent commitment to its subcontractor, D–E Industries, Inc., for latter's loss of profits and cost of tooling.

By its invitation No. CML–11–021–53–5 issued August 4, 1952, the United States Department of the Army called for competitive bids for the furnishing of 2,088,170 bomb parachute opening delay units designated as E10R1 in accordance with drawing No. D–14–32–3, and set forth that delivery was desired in

---

1. A specimen of these "bodies" (with the "clip" attached) is exhibit No. P–6 in evidence. The body, with attached clip, referred to in defendant's sub-contract with plaintiff, was intended to form a part of each of the Bomb Parachute Opening Delay, E10R1, which plaintiff was obligated to furnish to the United States Army Chemical Corps under its prime contract (exhibit No. P–18).

2. The "clip" was attached to the "body" by brazing. There was testimony that this brazing operation involved an average 15% loss of clips. The acceptance by plaintiff of defendant's product depended upon its approval, after inspection by inspectors for plaintiff and for the government respectively. Rejection of a body with brazed-on clip necessitated the loss of the clip, although the body of the reject in some instances could be "reworked."

3. The General Provisions of the Government contract authorized termination of the contract by the Government "if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof." The evidence fails to disclose any Government action under this Provision.

the following quantities in the following months, viz.:

| | |
|---|---|
| April 1953 | 104,409 |
| May 1953 | 313,255 |
| June 1953 | 417,634 |
| July 1953 | 417,634 |
| August 1953 | 417,634 |
| September 1953 | 417,634 |

Plaintiff was the successful bidder under this invitation and a contract [4] was accordingly awarded to it.

Plaintiff originally sub-contracted with D–E Industries, Inc. for some of the processing of the bomb parachute opening delay bodies referred to in the prime contract. This subcontractor was a corporation all of the stock in which was owned by Newman H. Drake, who was also the president and in exclusive managerial control thereof. By letter dated August 27, 1953, Mr. Drake advised the plaintiff as follows:

"Due to financial pressure we have found it necessary to introduce additional capital and have brought this about by forming a new company, namely, Drake Manufacturing Co., Inc. We therefore request that you cancel your P.O. to us, #8010–QQ–2, dated 7/2/53, for 464,038 pieces Bomb Delay Bodies, in its entirety, and re-issue it to Drake Manufacturing Co., Inc., Burgess Place, Mountain View, New Jersey. We also request that you cancel the unshipped balance of 361,000 pieces, Bomb Delay Bodies, on your P.O. #7810–WW–4, dated 7/2/53, in the original amount of 550,000 pieces.

"Upon the execution of these requests, we will automatically release you from all cancellation charges, legal responsibilities, and any other claims except any monies due on the final shipments against P.O. #7810–WW–4."

To the foregoing communication the plaintiff replied by letter of August 28, 1953 advising that it had cancelled and was reissuing purchase orders in accordance with the request of D–E Industries, Inc.; reminding the latter as follows:

"As you know, we have been depending upon you for a regular daily delivery of E10R1 acceptable bodies, and in response to this letter you are requested to immediately confirm in writing the schedule of shipping dates you will be able to maintain through the life of the aforementioned."

The superceding purchase order, #11,-603, dated October 28, 1953, expressly referred to the number of the plaintiff's contract with the Government and provided for shipment of the bodies contracted for in quantities of 200,000 during September 1953 and 161,000 during October 1953. Purchase Order 11,604, of the same date, provided for shipment of bodies as follows: "39,000 Oct. 1953; 212,519 Nov. 1953; 212,519 Dec. 1953; deliveries on this schedule to follow those on P.O. 11,603." Each of these purchase orders provided further, in part:

"The Clip, Dwg. B14–32–11 to be furnished by the Unexcelled Chemical Corporation,"

and each of the purchase orders prescribed the same unit price, $165 per thousand. Purchase Order 11,603 bore a stamped-on legend that it was covered by United States Government contract No. DA–11–021–401–CML–37, and Purchase Order 11,604 bore a similar stamp; referring however to CML–50 instead of CML–37. Each of these stamped legends provided that the purchase order was subject to all of the terms and conditions of the Government contract.

Drake Manufacturing Co., Inc. was the corporation to which each of the superceding purchase orders was issued.

---

4. By change order No. 34 of March 3, 1954 the Government revised the descriptive number of the Bomb Parachute Opening Delay from E10R1 to E10R2 which reflected a change in drawings and in certain specifications of the unit. In consequence of mutually recognized increased cost of performance to the prime contractor caused by change order No. 34, the Government agreed to pay to plaintiff a net additional amount of $51,316.38.

Mr. Newman Drake was president of both D–E Industries, Inc. and Drake Manufacturing Co., Inc. The former corporation owned 50% of the stock of the latter corporation; the balance being owned by one Goldman, or The Clifton Metal Products Company.[5]

Since the defendant admits that it failed to comply with the delivery schedules prescribed in the superceding purchase orders, it was guilty of a breach of the contract or contracts evidenced thereby unless its failure to perform in this respect has been shown to have been due to the failure of the plaintiff to comply with its contractual undertaking to furnish the clips necessary to enable the defendant to process and deliver the bodies. Much of the evidence adduced upon the trial bore upon the question of whether plaintiff made available to the defendant the necessary quantities of clips to permit the defendant to complete and deliver the required number of units as prescribed by the terms of the purchase orders. Mr. Drake testified that the clips which were to be supplied by the plaintiff were never furnished in sufficient quantities to enable the defendant to produce 10,000 units per day as claimed by the plaintiff. Plaintiff's plant manager, Lyman, testified on cross-examination that, during the period of September through December 1953, plaintiff did not deliver to defendant a sufficient quantity of clips to permit the defendant to produce 10,000 pieces a day during that period. Mr. Drake does, however, admit (as plaintiff asserts) that from July 1 to December 4, 1953 the defendant and its predecessor D–E Industries, Inc. received from or for the account of the plaintiff, 562,000 clips. He says that from July 7 to August 23, 1953 D–E shipped to the plaintiff 144,282 units;

having commenced on July 7 without any clips on hand. From delivery tickets attached to the answers to interrogatories we discern deliveries of 195,000 clips during July and 60,000 in August, for a total of 255,000 clips, against which we must credit the delivery by D–E of 144,282 bodies, leaving a balance on hand, at the time of the changeover from D–E to Drake, of 110,718 clips. In September the delivery tickets indicate a delivery to defendant on September 10 of 52,000 clips; making a total available to meet the September quota of 162,718 clips. However, during September Drake furnished only 3,782 acceptable units, which would leave a balance of 158,936 clips to meet subsequent quotas.

Because there is no indication in the record before me to the contrary, and by reason of the exception of October from the claimed deficiencies, we must assume that the defendant met its required quota for October, which is indicated as a total of 200,000 units. Utilizing the total of 158,936 available clips against this quota, we have a shortage going into November of 41,064 clips. On November 19 there was a delivery to Drake of 25,000 clips, leaving a net deficiency of 16,064 for November, and the records indicate acceptance of a total of 109,076 units during November, from Drake. This would make a total deficiency of 125,140 clips up to the commencement of December. On December 4 there was a delivery of 200,000 clips against which we must charge the shortage above referred to, which would leave a net of 74,860 clips against the December quota, and during December Drake shipped 144,631 accepted units. Thus we calculate a total of 69,771 delivered acceptable units in excess of the aggregate number of clips furnished by the plaintiff.

5. Henry Goldman was the proprietor or controlling stockholder of The Clifton Metal Products Company. He was also an employee of Shepard Metal Products Company, of which Louis Shapiro was president and principal stockholder. When D–E Industries, Inc. found itself in financial difficulty, Shapiro was instrumental in bringing Drake and Goldman together, and Goldman furnished new money for Drake's operations in exchange for 50% of the stock in the newly formed Drake Manufacturing Co., Inc. which was issued to Goldman's company. Goldman kept the books of Drake Manufacturing Co., Inc. Although he was present in Court during a portion of the trial, Goldman did not testify.

From the foregoing it will be noted that at no time, except during September, were there ever sufficient clips furnished to meet the actual deliveries of acceptable units; much less to meet the contract quotas. Mr. Drake testified that he would borrow from sources available to him when his supply of clips would run out, in order to enable him to keep his production line going. However, he also testified that by utilizing all available materials he was not able to obtain sufficient to accomplish this purpose during the period under consideration. From the foregoing analysis it would appear that, except for September and October, the defendant was shipping to the plaintiff more acceptable units than the number of clips which were made available to it, and the difference was made up by the borrowing of clips from other sources. These clip loans were, according to the testimony, repaid out of the shipments of clips as received from the plaintiff. Besides this disparity between the number of acceptable units shipped and the number of clips made available by the plaintiff, Drake asserted that there was a loss or wastage of clips in the brazing process amounting to an average of 15%. To offset these losses he made and paid for purchases of substitute clips which are not charged against the totals furnished for or in behalf of the plaintiff. The evidence also shows that very substantial portions of the defendant's shipments to the plaintiff were rejected for failure to meet specifications. Some of these rejects were reworkable to compliance with specifications, but re-use of clips where removal was required was not possible. None of this loss of clips was charged against the total number furnished by the plaintiff.

■ Plaintiff argues that, upon the figures testified to by Mr. Drake, there were probably available to the defendant, for the month of September, 225,000 clips, and for the month of November, 196,298; but the bases for such assumption are not indicated. As suggested above, the figures which I have used were taken from actual delivery tickets of clips, and acceptances shown on shipping tickets from Drake to Unexcelled. For aught that appears in the proofs, defendant's deliveries for all but the months of September, November and December, 1953, complied with the prescribed minima in the contracts. The minimum number of bodies called for to be delivered in September was 200,000. There were but 162,718 clips available and but 3,782 acceptable units supplied. Therefore, plaintiff is entitled to an allowance for that month on a 158,936 unit deficiency, which I compute to be $7,934.-09 (calculated upon the factor of $.04992). Excepting the month of September, I find that at no time did defendant ever have available from plaintiff a sufficient number of clips to permit compliance with its contract during November and December, and for that reason I allow no damages for any lack of deliveries during those months.

■ We pass to a consideration of the evidence upon the issue of plaintiff's damages chargeable to defendant's unexcused failure to meet its September delivery schedule. As already indicated, the plaintiff was committed, under its contract with the Government, to maintain minimum-quantity periodic deliveries. Plaintiff's contract with the defendant specifically referred and by its terms was made expressly subject to the provisions of the prime contract. I conclude that the delivery schedule was an essential feature of both contracts and that the plaintiff was dependent upon the defendant's maintenance of that delivery schedule in order to enable the plaintiff to comply with its obligation to the Government.

The evidence shows that in preparing its estimate for the purpose of bidding for the Government contract, the plaintiff computed the amount of overhead considered as chargeable to each unit of the product called for by the contract. This figure worked out to $.04992 per unit, and it represented the fixed charges appropriately allocable to the particular

contract divided by the number of units of production called for thereby. These fixed charges were primarily for fire and workmen's compensation insurance premium costs, real estate taxes on the premises used in the performance of the contract, and salaries of specially trained supervisory personnel participating in the production operations. Mr. Lyman explained that this unit overhead figure was calculated by prorating the total overhead cost of the Cranbury, New Jersey plant of the plaintiff among the various projects in progress at that plant, including the production under the Government contract. The factor of $.04992 was based upon an assumed production by the plaintiff, under its contract with the Government, of 30,000 acceptable units per day, and the plaintiff claims that the product of this factor and the deficiency in delivered acceptable bodies chargeable to the defendant in September 1953 represents the plaintiff's actual loss on this account during that month. I calculate this loss at $7,934.09 as stated above.

■ Mr. Lyman further testified that in preparing the plaintiff's bid for the Government contract he included a factor of $.02284 per unit representing the allocation to the particular contract, for the period estimated for its performance, of plaintiff's general administrative expense. This was arrived at by a computation similar to that employed in determining the factor for factory overhead. Plaintiff's vice-president and general manager testified that the factor of $.02284 employed in estimating the figure which his company bid for the government prime contract represented a proration to each of the units called for by the invitation of the aggregate amount, during the period contemplated for the production required, of "officers' salaries, New York office rent and staff, (and) a factory office staff of clerical and junior executive personnel." He admitted that these costs would be incurred irrespective of whether his company secured the contract, and that none of the personnel whose wages or salaries were

included in the calculation was specially trained for the particular work. I have concluded to disallow this item of claimed damage as too speculative and remote to be deemed to have been within the contemplation of the parties. See Restatement: Contracts, § 331; Patco Products, Inc., v. Wilson, 1950, 5 N.J. 543, 545, 76 A.2d 677; Marcus & Co. v. K. L. G. Baking Co., E. & A.1939, 122 N.J.L. 202, 3 A.2d 627; Weiss v. Revenue Building & Loan Association, E. & A.1936, 116 N.J.L. 208, 182 A. 891, 104 A.L.R. 129; and Hadley v. Baxendale, 9 Exch. 341.

Finally, plaintiff claims as damages the aggregate of moneys which it was required to pay by way of wages to employees hired to perform the prime contract on certain days when, in reliance upon promised or expected deliveries from the defendant which failed to materialize or to include a sufficient number of acceptable units, the employees specially assigned to this production "reported in" or were "called in" for work which they were unable to perform by reason of the unavailability of bodies upon which to work. The plaintiff, under its labor contract (Exhibit P–13), was required to pay its employees' wages for a specified minimum number of hours on a particular day, depending upon whether the employee was called in after being away from the plant, or reported for work without previously having been notified not to report. Such minimum wage-hours were payable irrespective of lack of available work. Plaintiff claims a total loss on this account of $2,904 for September 4, 16, 18 and 19, October 10 and December 28, 1953, and January 6, 1954.

■■ The contractual relationship between the parties sprang from and is to be construed by the language of the two purchase orders (numbered respectively 11,603 and 11,604 of October 28, 1953). By the terms of these orders defendant was required to deliver to plaintiff gross monthly shipments in specified quantities. No daily minimum is prescribed therein, but plaintiff's witness,

Lyman, testified that each subcontractor was aware that he was expected to deliver a certain daily minimum computable by treating a month as twenty working days. I construe the contract as requiring only gross monthly minimum deliveries and am not persuaded by the evidence that the parties intended that one-twentieth or other specific fraction of the monthly total should be delivered upon each working day. Furthermore, the preponderance of the evidence fails to support an inference that plaintiff was induced, by any representation made expressly or by the conduct of the defendant to expect that defendant would make delivery of any particular quantity on any particular day, or that plaintiff provided labor attendance in reliance upon such expectation. Plaintiff's claim for wages of unused special labor for September 4, 16, 18 and 19, October 10, and December 28, 1953 and January 5, 1954 in the amount of $2,904 is disallowed.

We pass now to a consideration of defendant's counterclaim for expenses incurred and profits lost by reason of plaintiff's cancellation, on March 18, 1954, of its contract with defendant, when there still remained undelivered 416,038 of the bodies called for by purchase order No. 11,604. The notice of cancellation was embodied in a telegram sent by plaintiff's purchasing agent to Drake on March 18, 1954 (Exhibit D–2 in evidence) which reads as follows: "Stop production immediately. Cancel P.O. number 11604 in its entirety due to change in design by government. Letter follows." The letter referred to, dated March 19, 1954 (Exhibit D–3) explained that the Government's change in design rendered the "old design bodies * * * obsolete." Defendant was requested to furnish plaintiff with a "complete inventory of all material * * * on hand, broken down between finished bodies, work in process and new material." Defendant was advised that a claim would have to be submitted to the Government for reimbursement for any material then on hand. Plaintiff concedes that defendant ulti-

mately completed its required deliveries under purchase order 11,603. Drake says the last delivery under that purchase order was made on February 11, 1954, and that he shipped and was paid for 28,000 more bodies than were called for thereby. Shipments of original design bodies under purchase order 11,604 commenced on February 18 and terminated on the date of plaintiff's cancellation of that contract. Drake testified that between March 10 and 17, 1954 he complained to O'Connor that because of lack of clips defendant was averaging only ten to twelve thousand pieces per week, although it was expected and equipped to turn out ten thousand per day. O'Connor is quoted by Drake as having told him that he would attempt to increase the rate of clip supply to defendant, but refused to assume the expense of having the clips made by defendant. On the same occasion the two representatives discussed a change in design of the body which the government was about to order and the consequent change in tooling which would be required to produce the new design. Upon receiving the cancellation telegram on March 18, Drake wrathfully telephoned O'Connor and demanded the reason for cancellation; claiming to have "gone into considerable expense to tool up for the new change." O'Connor told Drake not to worry, and that he would arrange to have defendant process all the pieces called for under the existing contract, of which there then remained a balance of 416,038 pieces. The evidence discloses that the processing of this balance was given to Shapiro's Shepard Metal Products Company which, at O'Connor's request, gave some of the work to Drake's company. Drake admits having produced and received payment for 300,343 of the foregoing 416,038 balance, but says he was not permitted to work on the remaining 115,695 because of inability to obtain the necessary blanks from Shapiro's company.

The purchase order (11,604) upon which defendant bases its counterclaim was made expressly subject to the provi-

**492**

sions of the prime (Government) contract. By the terms of the latter, changes by the Government in the drawings and specifications and consequent cancellation of sub-contracts were contemplated. General Provision #2 of the Government contract (Exhibit P–18 in evidence) provided that the Government "Contracting Officer may at any time, by a written order, * * * make changes within the general scope of this contract, in * * * drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith," and that "if any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment * * * must be asserted within 30 days from the date of receipt by the Contractor of the notification of change." The changes in drawings and specifications referred to in the cancellation telegram and confirming letter were described in and effected by Government change order No. 34, dated March 2, 1954. Purchase order 11,604 (Exhibit P–2) bore stamped upon its face the following legend:

"This Purchase Order is covered by U. S. Government Contract DA–11–021–401–CML–50 and is subject to all of the terms and conditions of the said contract, including the right of the Government to renegotiate the costs of our Prime Contract and consequently the sub-contract cost represented by this transaction."

Upon the reverse of the same purchase order (11,604) are set forth specific provisions respecting cancellation as follows:

"11. Cancellation.

"Without limitation on Buyers right to terminate this order as a matter of law for Seller's default, Buyer may terminate this order at any time by written notice to Seller, in which event, except as otherwise directed by said notice, Seller shall forthwith discontinue all work and the placing of orders, and shall cancel all commitments pertaining to this order. In full settlement of all claims arising out of such termination, Buyer will, within a reasonable time after such termination (or, if termination is because of the termination of Buyer's contract or contracts, for goods destined for United States Government use, in connection with which the goods covered by this order are being acquired, promptly after settlement of Buyer's claims arising out of the termination of such contract or contracts) pay Seller an amount to be determined by mutual agreement; provided that if Buyer and Seller are unable to agree upon termination charges, Buyer will pay to Seller the following:

"(a) The specified price for all completed goods;

"(b) The cost reasonably incurred with respect to the uncompleted portion of this order, including the amount of any reasonable expenditures made and/or obligations incurred in cancelling any commitments applicable to this order;

"(c) A percentage of the prospective profit on the uncompleted portion of this order equal to the percentage of completion of such portion.

"Seller's right to payment hereunder shall be conditioned upon delivery, in good condition and in accordance with specifications, to Buyer or Buyer's designee, f. o. b. Seller's plant, of the products, materials, inventories and other things for which compensation is provided hereunder, and Seller shall, in no event, be paid an amount in excess of the order price."

Thus, the parties contemplated that plaintiff might cancel the contract, and they agreed upon the measure of defendant's damages in such an event.

Plaintiff did not cancel because of defendant's default in meeting delivery schedules. The stated reason was the Government's change order. That change order became effective when 700,000 pieces remained to be delivered under the original contract between the Government and the plaintiff. Defendant made no deliveries of the new design directly to the plaintiff. However, Drake tells us that defendant actually produced under the new design work which O'Connor (plaintiff's president) induced Shepard Metal Products (Shapiro) to give to defendant. O'Connor did not testify; but Shapiro testified that, at O'Connor's request, he gave Drake some of the new work, for which defendant was paid through Shapiro's company. To do this work defendant must have been suitably equipped. Therefore whatever retooling was required had been accomplished.

Between the cancellation date (March 18, 1954) and June 30, 1954 defendant delivered 300,343 pieces, which were accepted and paid for by Shapiro; but Drake tells us that he could obtain no more blanks after the latter date. He claims, therefore, that plaintiff's cancellation of the contract on March 18, 1954 deprived defendant of the profit which it would have earned if it had been permitted to complete the remaining 115,960 units of the total originally allocated to it.

▄ The cancellation clause of the contract (P.O. 11,604) provides in part that the defendant shall be entitled, upon cancellation, to "a percentage of the prospective profit on the uncompleted portion of this order equal to the percentage of completion of such portion." Since the "uncompleted portion" of the order was not even partially completed in that blanks were not made available to defendant, no recovery of any profit thereon may be allowed.

▄ Defendant also claims as an item of damages $1,378.34 for costs of tooling prorated to the unproduced units under the contract. Plaintiff's estimate of tooling costs is more than 50% less than defendant's figure. I shall use the mean difference between these estimates. However, I construe the cancellation clause of the contract (P.O. 11,604) to entitle defendant, by reason of the cancellation, to "the cost reasonably incurred with respect to the uncompleted portion" of the purchase order (115,695 pieces), which I determine to be $976.16.

Plaintiff is allowed interest at 6% per annum upon its damages of $7,934.09 from October 1, 1953 to date of entry of judgment herein, and defendant is allowed interest at the same rate upon its damages of $976.16 from June 30, 1954 to date of entry of judgment herein. The amount so found due to defendant shall be credited against the amount so found due to plaintiff, and judgment for the difference shall be entered in favor of plaintiff against defendant, without costs.

This opinion shall be deemed to constitute this Court's findings of fact and conclusions of law as required by Rule 52 of the Rules of Civil Procedure, 28 U.S.C.

An order may be presented in conformity with the views herein expressed.